34 C.C.P.A. (Patents)

## In re PUGH.

### Patent Appeals No. 5313.

Court of Customs and Patent Appeals.

June 17, 1947.

Harry W. F. Glemser, of Washington, D. C. (John E. Stryker, of St. Paul, Minn., and Bair & Freeman and Anthony W. Molinare, all of Chicago, Ill., of counsel), for appellant.

W. W. Cochran, of Washington, D. C. (H. S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before BLAND, Acting Presiding Judge, and HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

O'CONNELL, Associate Judge.

This is an appeal from a decision of the Board of Appeals of the United States Patent Office affirming the action of the Primary Examiner in rejecting all the claims in appellant's application for a patent relating to an apparatus for testing and charging storage batteries of the type commonly used in motor vehicles.

Of the five appealed claims, Nos. 12, 13, 14, 15, and 21, appellant has moved to dismiss the appeal as to claims 13, 14, and 15. The motion will be granted thereby limiting the appeal to the remaining claims, 12 and 21. The references are: Oestermeyer 2,096,131 Oct. 19, 1937; Cheeseman 2,246,-163 June 17, 1941; Amsden 2,227,118 Dec

31, 1941. "Experimental Electrical Engineering" (Karapetoff) Vol. 1, 2d Ed., 1910, pages 403 and 404—John Wiley & Sons New York.

Claims 12 and 21 read as follows:

"12. Battery testing apparatus comprising, a load circuit having a predetermined fixed resistance adapted to discharge a battery at a normally high rate, a meter circuit connected to the battery terminals, a switch for closing said load circuit and a galvanometer included in said meter circuit, and calibrations and legends on the face of said galvanometer, said calibrations being placed thereon in predetermined relation to said fixed resistance to thereby indicate without further reference the time required to charge said battery at a predetermined high rate, said galvanometer being operative when said switch is closed.

"21. Battery testing apparatus comprising a battery load circuit, a switch for closing said load circuit, said switch being biased to opened position and manually closable against the bias, a resistance in said load circuit having an ohmage value substantially equal to that of a starting motor, a galvanometer carried across the battery terminals when said switch is closed, said galvanometer including calibrations and indicia for directly determining without the necessity of calculations the time in minutes during which ·the battery may be charged at a high rate without injury thereto."

Appellant's complete apparatus, which is intended to test and charge the battery without removing it from the automobile, includes a battery charger.

But only the testing part of the apparatus is here involved. That part comprises a load circuit, including a fixed or predetermined resistance adapted to discharge the battery to be tested. One terminal of the battery is adapted to be connected in the testing and charging circuits by two leads and the other terminal is adapted to be connected in the same circuits by two other leads.

The fixed resistance is adapted to discharge the battery at a normally high rate when the load circuit is closed with the aid of a manual switch or push button, spring biased to open position.

A meter circuit includes a combination voltmeter and ammeter instrument, defined by the claims on appeal as the "galvanometer," which is connected to the terminals of the batteries to be tested.

The dial of the galvanometer has calibrations and indicia, that is, a time indicator scale and legends, so related to the fixed load circuit as to indicate, without any calculations on the part of the operator, the exact and predetermined number of minutes required to properly charge the particular battery at a predetermined high and safe rate.

The voltmeter scale of appellant's testing zone and its relation to the issue here involved was discussed by the Board of Appeals in the following excerpt from its decision: "Great emphasis is placed by applicant on the fact that the galvanometer scale is calibrated to give reading, not in terms of volts or amperes but in terms that will give practical information to the operator or to the car driver. This is done by using the left half of the scale (the 'Testing Zone') for voltage readings, calibrated in terms that show three possible conditions of the battery, the sections (reading from left to right) showing: (1) worn out or sulfated; (2) partially charged and capable of being recharged; (3) fully charged. *The middle section (2) is further calibrated in terms of minutes that would be required to recharge to about 90% of the battery's capacity at a high-amperage rate."* (Italics not quoted.)

Although the examiner enumerated other grounds in the rejection of claims 12 and 21, the only ground of such rejection affirmed by the board was that the claims were not patentable over the disclosure of the Karapetoff reference in view of the Oestermeyer patent, and also as unpatentable over the Oestermeyer patent alone. Accordingly, it is deemed unnecessary to here discuss the reference patents to Amsden and Cheeseman.

The disclosure by Karapetoff in the publication, "Experimental Electrical Engineering," relates to the testing of electric batteries. Connections are disclosed for the test of a storage cell, the load circuit of which includes an adjustable resistance, for

discharge, a double-throw switch, and a voltmeter connected across the terminals of the cell.

More particularly, the disclosure of the Karapetoff publication relates to experiments to be performed by students in a laboratory as to the charge and discharge characteristics of an electric battery, with no specific reference to the batteries of an automobile. In conducting the experiment, the cell under test must be fully charged before beginning the experiment on the discharge characteristics, and "The time of charging should not be less than three hours if the cell has been completely discharged."

The patent to Oestermeyer relates to testers for various circuits and pieces of apparatus in the electrical system of a motor vehicle, including a test for measuring the voltage of the different cells of a multi-cell battery from a single voltmeter without changing the conductor connections from the battery to the test equipment.

A two-range voltmeter and a two-range ammeter are mounted on an instrument panel. On a dial of the voltmeter an inscribed scale is divided into the four headings. "Inoperative," "Low," "Fair," and "Good," "which," as stated in the specification, "are placed there particularly for the information of owners whose batteries are being tested."

The readings on the voltmeter are quickly obtained and are taken preferably under full load, that is, while the starting motor is running. The patentee's specification also calls for the use of a push-button switch in the operation of his device.

The concurring decisions of the tribunals of the Patent Office dealt largely with the rejection of appellant's claims for method, which are not now before the court. The examiner held that claims 12 and 21 were unpatentable over the disclosure of the publication by Karapetoff in view of the patent to Oestermeyer; that they were also unpatentable over the disclosure of the patent to Oestermeyer, standing alone; and were further unpatentable for the reason that they are clearly aggregative.

The Board of Appeals in affirming the decision of the examiner discussed his posi-

tion relative to the subject matter of the appealed claims and set forth its own position with reference thereto. The pertinent part of the board's decision reads as follows: "Claims 12 * * * and 21 all have as their principal novelty the reference to the fact that a scale of the galvanometer is calibrated so as to give a direct reading of charging time when the testing connections are made. The examiner's position is that no patentable novelty is recited by this distinction, since the indicia thus placed on the scale merely convey information to the operator. The same could be said if the voltmeter were merely calibrated in volts. However, we agree with the examiner's holding that no invention would be involved in calibrating the voltmeter of Karapetoff in time units or with any other indicia which represented an operator's estimate of approximate values. The structure is not thereby made different, but only the mental reaction of the observer is varied, due to the different indicia. Oestermeyer in Fig. 1 shows the scale divisions in the left-hand meter reciting the words 'Inoperative', 'Low', 'Fair', 'Good', for the same purpose as in applicant's device. We see no error in the rejection of claims 12 * * * and 21 on the art. We do not affirm the rejection of these claims as aggregative."

The Solicitor for the Patent Office and the tribunals thereof have not suggested that the particular feature upon which appellant relies to endow the rejected claims with patentability is specifically embodied in the cited references, singly or in combination.

Nor have they disputed appellant's contention that his device eliminates the need for skill and technical knowledge on the part of the operator thereof or that the particular meter calibration claimed by him does not constitute a desirable contribution to the art.

Their position is based upon the alleged fact that what appellant has done is what any person skilled in the art could have done with the disclosures of the art of record before him, and that no invention was therefore defined by the rejected claims.

The Solicitor for the Patent Office in his brief makes the following statement: "* * * Appellant's meter readings are based merely upon a different aspect of the * * * fact that the charge remaining in a battery is only the capacity of the battery minus what it takes to bring the remaining capacity up to full capacity. The capacity of a storage battery is measured in ampere-hours. * * * In other words, if a battery has a capacity of 100 ámpere-hours and voltage readings show a charge remaining of 50 ampere-hours, then 50 ampere-hours are required to bring the battery up to capacity. Or if the voltage readings show a charge remaining of 25 ampere-hours, then 75 ampere-hours of capacity are required to bring the battery up to charged condition. *Obviously if the ampere-hours of charging required are known, it is an easy matter to ascertain, by trial, or otherwise, how long a time at a given charging rate is required to bring the battery to full charge.*" (Italics not quoted.)

It would seem that in accordance with the prior art, even where the ampere-hours required for charging a battery are known, that in order to determine the length of time at a given charging rate which is necessary to fully charge the battery, that computation or calculation would be necessary on the part of the operator. Such calculation clearly is not required when appellant's device is used. The time necessary for charging in appellant's device is immediately known when the switch is turned to the "on" position.

Whether or not appellant was the first to discover the principle that in the case of batteries which are being recharged rapidly, the time required to restore the charge is proportional to the voltage readings when the battery is under load, he was the first, according to the facts presented in the record, to utilize that principle in obtaining a novel, new, and useful result.

Appellant not only discloses everything that is disclosed by the art of record but he also discloses something more. His device enables not only a mechanic skilled in the art but also an unskilled operator, as well as the owner of the car, to appraise the condition of a tested battery and immediately determine how long it will take to recharge it, or that it is in a suitable or unsuitable condition for such recharging.

The patent to Oestermeyer distinctly discloses a device for testing the condition of a battery and the same may be said of the testing device described in the disclosure by Karapetoff in the cited publication. Those references singly or combined do not disclose or teach the further feature shown by appellant of automatically fixing and recording the length of time required to restore the battery to its proper condition.

There is no merit in the suggestion that an apparatus for taking a measurement or making a calculation, which thereby records or conveys information to the public, is in and of itself destitute of the quality of invention or is unpatentable under the provisions of the patent laws.

Claims for such devices, as well as for an indicator, which likewise is an apparatus for conveying information, have been uniformly allowed by this court in proper cases. This is also true of cases decided in the Patent Office.

In our opinion, appellant has exercised the inventive faculty in producing an apparatus by the operation of which not only is the condition of the battery instantaneously determined but also the length of time required for recharging it is at the same time indicated.

If the determination of the issue here were in doubt, and we do not think it is, the great commercial success enjoyed by appellant in the sale and use of his device, amounting to approximately $2,000,000, would in our opinion be sufficient to impart patentability to the rejected claims.

The appeal as to claims 13, 14, and 15 is dismissed, and for the reasons stated, the decision of the Board of Appeals with respect to claims 12 and 21 is reversed.

Reversed.

By reason of illness, GARRETT, Presiding Judge, was not present at the argument of this case and did not participate in the decision.